UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E&S REALTY OF ROCKLAND, LLC, Plaintiff, v. EXXON MOBIL CORPORATION, f/k/a EXXON CORPORATION AND f/k/a MOBIL CORPORATION, and DOES 1 through 24, Defendants. | Case #04 CIV 1865 (B) AMENDED **COMPLAINT** |

PLAINTIFF, E&S REALTY OF ROCKLAND, LLC, by its attorney LAW OFFICE OF SHMUEL KLEIN, PC, for their ameded complaint against EXXON MOBIL CORPORATION, f/k/a EXXON CORPORATION and f/k/a MOBIL CORPORATION, and DOES 1 through 24, DEFENDANTS, as follows:

## PRELIMINARY STATEMENT

1. This is a civil action against EXXON MOBIL CORPORATION, f/k/a EXXON CORPORATION and f/k/a MOBIL CORPORATION, and DOES 1 through 24, DEFENDANTS under Sections 107 and 113(b) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§9607 and 9613(b), for recovery of costs incurred and to be incurred by the Plaintiff because of the release, or threatened release, and past contamination of hazardous substances at the 146 North Main ("Site"), located at 146 North Main (Route 45) Street in Spring Valley, Rockland County, New York. In addition, the Plaintiff seeks a declaratory judgment

pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), on liability that will be binding in future actions to recover further costs incurred at or in connection with the Site.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter, pursuant to 28 U.S.C. § 1345 and 42 U.S.C. §§ 9606(b), 9607(a) and (c)(3), and 9613(b).

3. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) and (c) and 42 U.S.C. § 9613(b), because the claims arose, and threatened and actual release of hazardous substances occurred, in this district.

## DEFENDANTS

3. Defendant EXXON MOBIL CORPORATION, f/k/a EXXON CORPORATION and f/k/a MOBIL CORPORATION, and DOES 1 through 24, is a former owner, supplier of petroleum product, supplier of petroleum storage tanks, did maintain petroleum storage tanks at the property on which the Site is located and a former operator, supplier and/or maintained the Site. Exxon is a “person” within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21). Exxon is liable under Section 107(a)(2) of CERCLA, 42 U.S.C. § 107(a)(2) as a person who owned or operated a facility at the time of disposal of a hazardous substance.

## GENERAL ALLEGATIONS

**History of the Site**

4. The Site is located at 146 North Main (Route 45) Street (at the intersection of North Main (Route 45) and Columbus Avenue) in Spring Valley, Rockland County, New York. The Site contains a gasoline station for retail sale.

5. The Site is surrounded by a mixture of residential and commercial properties. The Spring Valley Creek is located adjacent to the Site and leads into the Hudson River. The Rockland County Community College, together with a day care center, is located in close proximity to the Site.

6. Enacted in 1980, CERCLA was designed to "provide for liability, compensation, cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites." Pub. L. No. 96- 510, 94 Stat. 2767 (1980). It generally imposes liability on owners and operators of facilities throughout the nation at which hazardous substances were improperly disposed. 42 U.S.C. § 9607(a). Through creation of the "Superfund," the federal government is empowered to respond to hazardous waste disposal. *See* 42 U.S.C. §§ 9604-9605, 9611-9612.and such other applicable laws and statutes.

## PARTIES

7. PLAINTIFF, E&S REALTY OF ROCKLAND, LLC, is the owner of a certain parcel of land known as 146 North Main Street in the Village of Spring Valley, in the Town of Ramapo, County of Rockland, New York (herein referred to as the "site").

8. During recent Subsurface Investigation of the property in December of 2003, as follow-up of a spill discovered in 1999, the soil beneath the service station was still found to be contaminated with gasoline containing, among other things, Lead, MTBE, Tetraethyl lead (TEL), Naphthalene and Toluene, in amounts that exceed the NYSDEC Groundwater and Soil Contamination Standards. The plume of gasoline contamination is believed to be moving downgrade toward the municipalities underground water supply. This plume upon knowledge and belief will threaten and/or contaminate (i.e. poison) the above mentioned water supply was with gasoline. The origins of methyl bromide production (the chemical ingredient put in gasoline by Exxon to make "leaded gasoline) date back to the advent of the chemical industry and the evolution of some of the most powerful players in corporate America today.

9. It was in 1920 a team of GM-DuPont scientists, led by Charles Kettering and Thomas Midgley perfected an anti-knock gasoline additive that boosted octane content. After first marketing the "no knock" tetraethyl lead in 1922, GM-DuPont formed a 50-50 joint venture with the most powerful of petroleum corporations, Standard Oil of New Jersey (known today as Exxon), to produce and market the chemical. The new company was called the Ethyl Corporation. Almost immediately, Ethyl ran into trouble. Or, as the transnational's official history puts it, "if ever a company started its corporate life under bleak circumstances, it was Ethyl." Scientists raised concerns that automobiles running on leaded gasoline were "a serious menace to the public health." And in 1924 the story broke that 80 percent of the workers who produced tetraethyl lead had either been killed or were suffering acute poisoining. Employees suffered such severe nerve damage and extensive hallucinations at one refinery that it was dubbed "the House of Butterflies." The companies tightened safety standards in their factories, but

public concern about the toxicity of fumes from leaded gasoline continued. In response, Ethyl's product was pulled from the market as the Surgeon General set up a panel of scientists to study the problem.

10. But Ethyl, supported by its owners -- DuPont, GM and Exxon -- fought back, contradicting a growing body of scientific evidence with a bold public relations and lobbying campaign. Ethyl and its powerful backers questioned the scientific basis of the move to ban their product, asking "because some animals die, and some do not die in some experiments, shall we give this thing up entirely?"

11. The campaign was successful. The Surgeon General's panel concluded that "there are at present no good grounds for prohibiting the use of ethyl gasoline." The panel called for further studies that were never conducted, leaving generations of people to suffer the consequences.

In 1972, the same year it banned DDT, the US government finally ordered the phase out of leaded gasoline in the United States. Ethyl and Great Lakes followed a three track strategy in response. First, they fought the phase-out claiming that leaded gasoline emissions posed no human health hazards. To this day, they deny the hazards of TEL. As late as 1990 for instance, Floyd D. Gottwald Jr., then CEO of Ethyl and today Chairman and CEO of Albemarle, claimed that "no conclusive scientific evidence has ever linked the use of lead in gasoline to human health problems."

12. Second, they globalized their production and distribution, developing international markets for leaded "anti-knock" gasoline. The globalization of leaded gasoline, has made TEL responsible for nearly 90 percent of airborne lead pollution in Third World cities today. International political pressure and the fact that this market is now shrinking (even the World Bank is calling for TEL's elimination), has spurred most corporations, including Ethyl and DuPont, to stop producing it completely.

13. And third, they diversified their production at home. Ethyl developed the contraversial manganese based MMT additive in an effort to replace TEL. And the company found many new uses for the bromine that had gone into a component of TEL called ethelyene dibromide (EDB). One of the byproducts of this diversification is methyl bromide.

14. Since the virtual disappearance of leaded gas in the United States (it's still sold for use in propeller airplanes), the mean blood-lead level of the American population has declined more than 75 percent. A 1985 EPA study estimated that as many as 5,000 Americans died annually from lead-related heart disease prior to the country's lead phaseout. According to a 1988 report to Congress on childhood lead poisoning in America by the government's Agency for Toxic Substances and Disease Registry, one can estimate that the blood-lead levels of up to 2 million children were reduced every year to below toxic levels between 1970 and 1987 as leaded gasoline use was reduced. From that report and elsewhere, one can conservatively estimate that a total of about 68 million young children had toxic exposures to lead from gasoline from 1927 to 1987

15. PLAINTIFF discovered wide-spread contanmination in the ground while doing clean-up in 1999 to build a new station (i.e. digging to replace the Exxon old steel tanks and put in new fiberglass ones.) Underground were five (5) steel Exxon tanks, two of which were unknown to PLAINTIFF, at the time of the purchase of the service station.

16. The steel Exxon tanks that PLAINTIFF removed from the ground were extremely corroded. It was evident that contamination of the ground had occurred over the years that DEFENDANT Exxon Mobil, owned and/or maintained the station. Upon information and belief, Exxon at first plugged and repaired the tanks because of wide-spread leakage. Then Exxon re-lined the tanks. Further, tanks

were to be removed, and new ones installed. The corroded tanks were never removed. Samples of soil and groundwater were taken at the time of the dig to be tested for contamination. Excessive contamination of aged gasoline including lead and MTBE were found requiring cleanup of the soil and upon information and belief had never been done previously.

17. DEFENDANT Exxon Mobil Corporation, f/k/a Exxon Corporation and f/k/a Mobil Corporation, was and is a duly organized foreign corporation (collectively referred to as “Exxon Mobil”) authorized to do business in the State of New York.

18. DEFENDANT Exxon Mobil was and is a duly organized domestic corporation authorized to do business in the State of New York.

19. DEFENDANT Exxon Mobil was and is a duly organized domestic corporation transacting business in the State of New York.

20. DEFENDANT Exxon Mobil was and is a duly organized foreign corporation transacting business in the State of New York.

21. DEFENDANT Exxon Mobil does and/or solicits business within the State of New York.

22. DEFENDANT Exxon Mobil derives substantial revenue from goods used or consumed or services rendered in the State of New York.

23. DEFENDANT Exxon Mobil derives substantial revenue from interstate or international commerce.

24. DEFENDANT Exxon Mobil expected or should have expected its acts and business activities to have consequences within the State of New York.

25. DEFENDANT Exxon Mobil supplies petroleum storage tanks and maintains the same and did not inspect for and clean up spills on the premises located at 146 North Main Street, Spring Valley, New York, as indicated in the soil samples taken from the site containing extreme contamination of aged gasoline, lead and MTBE.

26. DEFENDANT Exxon Mobil Corporation is a company that buys gasoline from oil refineries and delivers it to gasoline stations.

27. DEFENDANT Exxon Mobil is a company that processes, or otherwise distributes gasoline from oil refineries and delivers it to gasoline stations.

28. "DOE" DEFENDANTS are corporations, partnerships, associations, natural persons or other entities that manufacture, distribute, maintain and install steel gasoline tanks.

28. "DOE" DEFENDANTS process, or otherwise distribute gasoline from oil refineries and deliver it to gasoline stations (hereinafter "Jobbers"). The Jobber DEFENDANTS in this Action have delivered MTBE, Naphthalene and Toluene in gasoline to the Plaintiff Spring Valley gasoline station.

29. For purposes of this Complaint, when the term "DEFENDANTS" is used alone, it refers to all Defendants and third parties named or to be named herein jointly and severally.

30. There are no limitations on liability as set forth applicable to this action in that one or more of the exceptions set forth apply.

31. Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries affiliates and division of the entity.

32. DEFENDANT Exxon Mobil intentionally did not clean up the spill resulting in gasoline contamination of the property.

33. Gasoline containing lead, MTBE, Naphthalene and Toluene was placed into underground storage tanks at the premises, 146 North Main Street, Spring Valley, New York.

34. DEFENDANT Exxon Mobil did not properly maintain, or inspect the tanks for corrosion or leakage.

34. DEFENDANT Exxon Mobil intentionally did not test for contamination of the ground, from leaking tanks nor clean up spills they knew typically happen on a service station from consumers topping off their cars or Jobbers overfilling the tanks.

35. DEFENDANTS have extensive knowledge of all phases of the petroleum business, from the extraction of crude oils, to the refining and/or distribution, marketing and retail sale of gasoline, petroleum storage tanks, design and manufacture of gasoline containing lead, MTBE, Naphthalene and Toluene.

36. DEFENDANTS are engaged in the business of providing gasoline containing lead, MTBE, Naphthalene and Toluene to consumers, including PLAINTIFF, in the State of New York.

37. DEFENDANTS DOES 1-24, are named herein under fictitious names, their true names and capacities being unknown to PLAINTIFF. PLAINTIFF is informed and believes, and thereon alleges, that each of said DOES are responsible, in some actionable manner, for the event and happening hereinafter referred to, either through said DEFENDANTS' conduct, or through the conduct of DEFENDANTS' agents, servants or employees, or in some other manner, causing the harms alleged by PLAINTIFF in this complaint.

38. PLAINTIFF does not know the true names or capacities of all the persons or entities sued herein DOES 1 through 24, inclusive, and therefore sues these DEFENDANTS by such fictitious

names. PLAINTIFF will amend this complaint to set forth the names and capacities of said DEFENDANTS along with appropriate charging allegations when the same have been ascertained.

39. When, in this complaint reference is made to any act of the DEFENDANTS, such shall be deemed to mean that the officers, directors, agents, employees, or representatives of the DEFENDANTS committed or authorized such acts, or failed to and omitted to adequately supervise or to properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of the DEFENDANTS and did so while acting within the scope of their employment or agency.

## FACTUAL ALLEGATIONS

40. Plaintiff repeats each and every allegation in paragraphs 1-39 herein.

41. Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), as amended, provides in pertinent part:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section –
> (1) the owner and operator of a vessel or facility,
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, . . from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for --
> (A) all costs of removal or remedial action incurred by the Plaintiff Government . . . not inconsistent with the national contingency plan; . . .

42. Hazardous substances, including lead and chromium, were found at the Site. These substances are hazardous within the meaning of Section 101(14) of CERCLA, 42 U.S.C.

§ 9601(14).

43. Hazardous substances found at the Site were released or threatened to be released into the environment within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22), and these hazardous substances were disposed of at the Site within the meaning of Section 101(29) of CERCLA, 42 U.S.C. § 9601(29).

44. The Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

45. To protect the public health, welfare and the environment from the actual or threatened release of hazardous substances into the environment from the Site, the Plaintiff pursuant to Section 104(a) of CERCLA, 42 U.S.C. § 9604(a), has undertaken response activities with respect to the Site that are not inconsistent with the NCP, including investigations, monitoring, assessing, testing, enforcement activities, and removal activities in connection with releases of hazardous substances.

46. Defendants Exxon, and unnamed DOES are liable under Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(1) as owners or operators of a facility at the time of disposal of a hazardous substance.

47. In connection with the release and/or threatened release of hazardous substances at the Site, the Plaintiff has incurred unreimbursed response costs in excess of $210,000.00. These costs were incurred in a manner not inconsistent with the National Contingency Plan ("NCP"), 40 C.F.R. Part 300. The Plaintiff will continue to incur response costs, including enforcement costs, in connection with the Site.

48. Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Defendants are jointly and severally liable for all costs recoverable under CERCLA incurred and to be incurred by the Plaintiff in connection with the Site.

49. The Nature of the Gasoline Groundwater and Soil Contamination Problem

MTBE is a member of a class of chemical compounds, ethers, whose unique properties have enhanced solubility in water and chemical attraction to water molecules.

50. MTBE is many times more soluble in water than other components of gasoline. MTBE is "hydrophilic" or water seeking and travels rapidly through soil and into groundwater. Whenever gasoline containing MTBE leaks spills or otherwise is released into the environment, the MTBE quickly reaches the water table and contaminates the wells that draw from the affected underground aquifers.

51. MTBE has a low octanol water partition coefficient and North Main (Route 45) solubility in water, particularly as compared to the other common gasoline components benzene, toluene, ethylbenzene and xylene (collectively "BTEX" compounds). When MTBE and gasoline are spilled on the ground, the BTEX compounds tend to absorb or bind to soil. In contrast, MTBE does not adhere to the soil particles but instead travels rapidly through soil, mixing with water and contaminating underground aquifers.

52. MTBE not only travels faster and further from spill and leak sources and is found in far North Main (Route 45)er concentrations as a groundwater contaminant than BTEX compounds, it also is slow to degrade or break down once it is released into the environment, particularly in the subsurface of the ground. Because of its "recalcitrance," plumes of MTBE can persist in underground aquifers for decades.

53. Every year more than nine million gallons of gasoline, equal to a full supertanker, escapes during transportation, storage, sale or consumer use in the United States. Although DEFENDANTS were aware of the problem of such spills and leaks, and in particular the widespread problem of contamination due to gasoline leakage into the ground, they willfully and recklessly chose to put gasoline containing Naphthalene and Toluene into commerce and, for example, into leaking underground storage tanks, with full knowledge of its tendency to contaminate soil and groundwater.

54. DEFENDANTS were aware that thousands of gallons of gasoline containing MTBE, Naphthalene and Toluene also enter the ground from gas stations due to consumer overfills of gas tanks, as well as Jobber overfills of underground storage tanks.

55. MTBE is volatile during transport, storage and fueling resulting in evaporation into the atmosphere where it mixes with water vapor and returns in rainfall.

56. The greater the MTBE content of gasoline the North Main (Route 45)er the risk to water, however, even small concentrations of MTBE create an enhanced threat to groundwater.

57. Despite DEFENDANTS' awareness of the threat gasoline containing MTBE poses to groundwater, DEFENDANTS have made MTBE the oil industry's oxygenate of choice.

58. Despite DEFENDANTS' awareness of the threat gasoline containing lead poses to the general public, DEFENDANTS made lead the oil industry's "anti-knock" "high-octane" choice.

59. DEFENDANTS, who have all marketed and promoted the use of gasoline containing lead and MTBE for its purported environmental benefits, knew or should have known of the terrible downside of the proliferating use of the compound: contamination of groundwater and soil;.

60. DEFENDANTS have threatened, and/or recklessly contaminated the property of E&S REALTY OF ROCKLAND, LLC in the village of Spring Valley, New York, by placing gasoline containing lead, MTBE, Naphthalene and Toluene into corroded and leaking underground storage tanks without any thought of adequately maintaining and inspecting the tanks nor periodical testing and cleanup of the soil.

61. As a result of the discovery of the spill in 1999, the New York Department of Environmental Management ("DEM") conducted an investigation to determine the concentration of the contamination possible migration of the dissolved petroleum plume. They determined that PLAINTIFF's service station located on 146 North Main Street, Spring Valley, New York had extraordinary North Main (Route 45) levels of Naphthalene and Toluene in test sites drilled in the property, and the migration of the plume that occurred may be jeopardizing the Village of Spring Valley's municipal-fed drinking water. PLAINTIFF's property is in close proximity to United Water's fresh drinking water well field.

62. DEM has continued to dig test sites in the area of the PLAINTIFF'S gas/service station in an effort to determine the extent of the contamination by said Defendants.

63. Contamination in amounts exceeding the NYSDEC Groundwater Standards were found. As a result of said contamination, PLAINTIFF has been required to use various costly methods of cleanup, to remove the environmental mess created by the negligence and carelessness of DEFENDANT, Exxon Mobil.

64. As of this date, PLAINTIFF's property is still contaminated by lead, MTBE, Naphthalene and Toluene and other chemicals.

65. PLAINTIFF has expended large sums of money and will be required to expend other large sums of money to remedy the contamination of said property.

66. The harm suffered by PLAINTIFF was a result of DEFENDANTS' acts and omissions. Such acts and omissions were actuated by actual malice or accompanied by a wanton or willful disregard for the safety of product users, consumers, and others who foreseeably might be harmed by MTBE, Naphthalene and Toluene, including PLAINTIFF. DEFENDANTS engaged in intentional wrongdoing, by not doing sufficient testing for leaks and maintaining of the tanks and for not cleaning the soil that they knew chemicals had leaked into (where it would migrate to contaminate drinking water).

67. DEFENDANTS failed to remedy the threat and/or contamination. DEFENDANTS allowed the threat of contamination to spread without warning PLAINTIFF, and without concern for the health and safety of PLAINTIFF and Plaintiff's property.

**FIRST CAUSE OF ACTION: NEGLIGENCE**

68. PLAINTIFF repeats and incorporates by reference as if fully set forth herein the allegations contained in Paragraphs 1 through 61 inclusive.

69. DEFENDANT Exxon Mobil stored leaded, MTBE, Naphthalene and Toluene gasoline.

70. DEFENDANT Exxon Mobil mixed lead, MTBE, Naphthalene and Toluene with gasoline.

71. DEFENDANT Exxon Mobil sold leaded, MTBE, Naphthalene and Toluene with gasoline.

72. DEFENDANT Exxon Mobil transported lead, MTBE, Naphthalene and Toluene with gasoline.

73. All DEFENDANTS stored, mixed, sold and/or transported lead, MTBE, Naphthalene and Toluene with gasoline.

74. MTBE's propensity to contaminate water is so menacing that even if gasoline storage tanks and pipelines were completely impenetrable, which they are not, the mixing of MTBE in gasoline would still pose a significant threat to groundwater.

75. Lead additives were used in Exxon gasoline for over 50 years until they were banned in 1986. Lead accumulations are especially high in the plaintiff's soil. Children who live in these areas and play in these soils are particularly vulnerable to lead poisoning.

76. Despite DEFENDANTS' past and current knowledge of lead, MTBE's harmful characteristics, DEFENDANTS have placed, and continue to place, gasoline containing lead, MTBE, Naphthalene and Toluene into the New York stream of commerce without taking any special precautions to prevent lead, MTBE, Naphthalene and Toluene contamination.

77. Lead, MTBE, Naphthalene and Toluene should not have been mass-produced and distributed to gasoline station now owned by E&S REALTY OF ROCKLAND, LLC without proper education and without warning of lead, MTBE, Naphthalene and Toluene's propensity to contaminate soil and water. Moreover, DEFENDANTS should have properly inspected, repaired and maintained the underground tanks to limit gasoline contamination of Plaintiff's property as well educated and warned the governmental agencies, other gasoline station owners and operators, and the public (including PLAINTIFF) of lead, MTBE's negative environmental characteristics, prior to placing lead, MTBE, Naphthalene and Toluene into the stream of commerce.

78. DEFENDANTS further knew, or should have known, that when MTBE, Naphthalene and Toluene was placed into gasoline systems that there was a strong probability that it would escape into

the surrounding environment and contaminate and they did no inspections maintenance or cleanup to prevent widespread contamination.

79. DEFENDANTS owed PLAINTIFF a duty of due care which could be satisfied by safe and proper use, management, storage, maintenance, repairs and cleanup with regard to the upkeep and safety of the gasoline/service station. DEFENDANTS had a specific duty to prevent the discharge or release of such substances, which might harm the persons, property, or economic interests of PLAINTIFF. DEFENDANTS also had a specific duty to warn or notify PLAINTIFF that discharges or releases of these substances threatened PLAINTIFF's property.

80. DEFENDANTS breached these duties by their negligent, and reckless management, storage, and use of its petroleum related products. These actual releases and discharges have subjected PLAINTIFF to actual injuries to its property and economic interests. DEFENDANTS also failed to warn PLAINTIFF of the releases of such substances in PLAINTIFF's property and of the reasonably foreseeable effects of such releases, an omission that was reckless, grossly negligent, and/or negligent.

81. DEFENDANTS' negligence was a direct and proximate cause of injuries to PLAINTIFF causing both actual present harm to PLAINTIFF's property and economic interests and creating an increased risk of harm to its property. PLAINTIFF is entitled to recover damages for such injuries and anticipated additional costs for damage to its property.

82. All injuries and damages to PLAINTIFF are substantial. The amount of damages for some of the injuries are estimated at $1,000,000.00.

**COUNT TWO: BREACH OF FIDUCIARY DUTY**

83. PLAINTIFF repeats and incorporates by reference as if fully set forth herein the allegations contained in Paragraphs 1 through 82 inclusive.

84. DEFENDANTS breached their duty to make sure that their product was safe before putting it into the stream of commerce. Specifically, DEFENDANTS failed to take appropriate precautions to prevent/protect PLAINTIFF's property, from being threatened and/or contaminated with lead, MTBE, Naphthalene and Toluene. In failing to take adequate steps to prevent MTBE, Naphthalene and Toluene ground contamination, DEFENDANTS also breached their duty to protect PLAINTIFF who purchased the gas/service station from them.

85. DEFENDANTS further breached their duty to prevent gasoline from being discharged and released into the soil and groundwater. DEFENDANTS failed to clean up the soil before the sale of the former Exxon branded gasoline station. As a result of having gasoline delivered to leaking tanks in the former Exxon gasoline station, contamination of the ground had occurred.

As a direct and proximate result of DEFENDANTS' breach of their duties, as outlined above, PLAINTIFF has suffered extensive damages in an amount estimated at $1,000,000.00.

86. Once DEFENDANTS knew that contamination was being discharged into the soil and groundwater underneath the Exxon Mobil gasoline station, they did nothing to prevent, test for or remedy the contamination of the property.

87. As a direct and proximate result of DEFENDANTS' breach of their duties, as outlined above, PLAINTIFF has suffered extensive damages estimated at $1,000,000.00

88. Moreover, DEFENDANTS willfully and intentionally breached their duty of care and acted with conscious disregard of PLAINTIFF's safety.

89. PLAINTIFF has suffered great harm from DEFENDANTS' conduct and is entitled to recover punitive or exemplary damages.

90. DEFENDANTS while owning this gas/service station had a duty to comply with applicable state, federal and local government laws, regulations, and guidelines applicable to persons managing, storing, using, selling and distributing petroleum related compounds.

91. These laws and regulations were intended for the protection of public and private health, safety, property and economic interests.

92. PLAINTIFF is within the group of people designed to be protected by the above laws and regulations.

93. These violations of applicable state, federal and local laws, regulations and guidelines were a direct and proximate cause of PLAINTIFF's injuries. The actual present harm to PLAINTIFF's property and economic interests are precisely the types of injuries these applicable laws were designed to prevent. Violation of these statutes and regulations thereby constitutes per se negligence.

94. DEFENDANTS' negligence was a direct and proximate cause of injuries to PLAINTIFF causing both actual present harm to PLAINTIFF's properties and economic interest.

95. All injuries and damages to PLAINTIFF are substantial. The amount of damages is estimated in the amount of $1,000,000.00.

**COUNT THREE: RECKLESS BREACH OF FIDUCIARY DUTY**

96. PLAINTIFF repeats and incorporates by reference as if fully set forth herein the allegations contained in Paragraphs 1 through 95 inclusive.

97. Moreover, DEFENDANTS willfully and intentionally breached their duty of care and acted with conscious disregard of PLAINTIFF's safety with malice and oppression for which punitive and exemplary damages should be imposed.

98. PLAINTIFF has suffered great harm from DEFENDANTS' conduct and is entitled to recover punitive or exemplary damages.

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF demands judgment in its favor against DEFENDANTS:

a) a declaration by the Court that DEFENDANTS, and each of them, have been and continue to be in violation of the above legal duties;

b) Awarding PLAINTIFF compensatory damages in an amount in excess of this Court's minimal jurisdictional limits;

c) Awarding PLAINTIFF punitive damages in an estimated at $1,000,000.00;

d) Awarding PLAINTIFF the costs of this lawsuit, including but not limited to attorneys' fees and expert costs as authorized by Statute and the applicable rules of this Court;

e) Requiring DEFENDANTS to pay all of the PLAINTIFF's past costs for digging and replacing the corroded tanks;

f) Requiring DEFENDANTS to pay all of the PLAINTIFF's past costs for continuous testing of the soil for contamination;

g) Requiring DEFENDANTS to pay all of the PLAINTIFF's past costs for cleanup;

h) Requiring DEFENDANTS to pay all future costs incurred by PLAINTIFF for environmental cleanup of the property;

i) Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that the DEFENDANTS caused to be discharged in PLAINTIFF's property;

j) An Order mandating that the DEFENDANTS, and each of them, and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded;

k) Awarding PLAINTIFF such other, further, and different relief as the Court may deem appropriate and just.

Dated: February 25, 2005

By PLAINTIFF's Attorney,
Shmuel Klein (sk7212)

/s/____________________________
Law offices of Shmuel Klein PC
268 West Route 59
Spring Valley, NY 10977
845-425-2510